BEAUMONT, S. L. & W. RY. CO. v. MOORE.
(No. 6612.)

(Court of Civil Appeals of Texas. Galveston. Jan. 22, 1915. Rehearing Denied Feb. 25, 1915.)

1. RAILROADS ⬦⟶216 — CONSTRUCTION OF SPUR TRACKS—CONTRACTUAL OBLIGATIONS.

A railway company, contracting with a lumber company for the construction and operation of a spur track for the exclusive benefit of the lumber company, is under no contract obligation to furnish cars for a subsequent seller of timber to the lumber company to be delivered on board cars on the spur track.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 713; Dec. Dig. ⬦⟶216.]

2. CARRIERS ⬦⟶40—OBLIGATION TO FURNISH CARS—SPUR TRACKS.

A railway company, contracting with a lumber company for the construction and maintenance of a spur track for the exclusive benefit of the lumber company, is under no obligation to one as a member of the public to furnish cars for the shipment of freight from the spur; for railroads need only furnish cars for the shipment of freight at stations or points on their roads provided for the service of the public or where the railroads are in the habit of accepting freight from any person offering same for transportation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120–122; Dec. Dig. ⬦⟶40.]

3. CARRIERS ⬦⟶44 — CONSTRUCTION OF SPUR TRACKS—OBLIGATION TO FURNISH CARS.

Where a railway company contracted with a lumber company for a spur track for the exclusive benefit of the lumber company, and thereafter the lumber company contracted for the purchase from a third person of logs to be delivered on board the railway company's cars on the spur, the third person, making no demand on the railway company to furnish any specified number of empty cars at the spur, but only complaining that not enough cars were furnished, and that those furnished and loaded were not transported promptly, had no cause of action against the railway company.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120–122, 230; Dec. Dig. ⬦⟶44.]

4. CARRIERS ⬦⟶44—BREACH OF CONTRACT— SPECIAL DAMAGES.

A railway company, contracting with a lumber company to construct and maintain a spur track for the exclusive use of the lumber company, is not liable for damages claimed by a subsequent seller of timber to the lumber company, to be loaded on cars on the spur, in the absence of proof that the railway company had notice of the contract of sale and of facts which would cause damages for failure to furnish cars.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 120–122, 230; Dec. Dig. ⬦⟶44.]

Appeal from District Court, Liberty County; J. L. Llewellyn, Judge.

Action by A. I. Moore against the Beaumont, Sour Lake & Western Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

Andrews, Ball & Streetman, Coke K. Burns, and W. L. Cook, all of Houston, for appellant. Marshall & Harrison, of Liberty, for appellee.

PLEASANTS, C. J. This is a suit to recover damages, brought by the appellee against the appellant.

Plaintiff's amended petition, upon which the case was tried, alleges, in substance, that in February, 1911, he entered into a contract with the Bradford-Hicks Lumber Company by which said company purchased from plaintiff the timber upon a tract of 153 acres of land in Liberty county, and agreed to pay plaintiff therefor the sum of $7 per 1,000 feet, delivered on board defendant's cars on Bradford's spur of defendant's railway in Liberty county, and said logs of timber, when so delivered, were to be transported by defendant over its railway to the sawmill of said lumber company at Dyersdale, in Harris county. It is further alleged that in fulfillment of said contract plaintiff, during all the time between June 9 and September 27, 1911, had sufficient logs to have made delivery thereof in accordance with his said contract to the amount of 15,000 feet per day, exclusive of Sundays, but that, because of the failure and refusal of defendant to furnish sufficient cars at said spur to transport plaintiff's logs, and the failure to promptly transport the cars after they were loaded, plaintiff was greatly hindered and delayed and caused much expense in making delivery of logs under his said contract. It is alleged that there were 78 days in all, excluding Sundays, between June 9, 1911, and September 27, 1911; that plaintiff would have loaded and shipped 15,000 feet per day, except for the fact alleged that defendant on said days negligently, carelessly, and deliberately failed and refused to furnish cars "whereby plaintiff could and would have transported 15,000 feet of logs per day under his contract with the Bradford-Hicks Lumber Company." The measure of damages is alleged as follows:

"Now, plaintiff shows that, by reason of the failure and refusal of said defendant company to furnish him cars as aforesaid on the dates hereinbefore set forth, and by reason of the refusal and failure of the defendant company to remove and transport the cars of logs loaded by plaintiff, and ready for shipment to Dyersdale, Tex., on the dates hereinbefore set forth, the plaintiff has been damaged in the sum of $4,095, that being the value of plaintiff's time, and the expenses of the plaintiff during the 78 days hereinbefore set forth while the plaintiff was waiting for defendant company to furnish cars and remove loaded cars as above set forth.

"Plaintiff further shows that, had said defendant company furnished him cars and removed said loaded cars during said 78 days, he would have and could have realized out of his contract the amount above set forth, to wit, $4,095, more than plaintiff has and did realize out of said contract with Bradford-Hicks Lumber Company, more particularly setting forth the items of damage suffered by plaintiff as mentioned in this sixth paragraph. The plaintiff says that his actual expenses during the 78 days mentioned were $594; that the value of his time was $565; and plaintiff says that he had, during said time, 24 head of oxen, 4 head of mules, 4 well-equipped log wagons, with all other equipment necessary for logging work and hauling work, by which plaintiff would and could have realized out of during the said 78 days, but for defendant company's failure and refusal to remove cars and furnish cars as aforesaid, $3,629.50. Plaintiff further shows that the above items of actual expenses were incurred by paying drivers, feed of teams, value of plaintiff's time as set forth, and that the value of said teams and wagons during said time are reasonable charges and prices. Plaintiff further shows that after deducting his expenses, $594.50, that he was damaged by reason set forth herein in the sum of $4,095.

"Plaintiff now shows the court that during the 78 days the Bradford-Hicks Lumber Company would have received and paid the plaintiff for the logs at least 15,000 feet per day, and that plaintiff, during all of said time, was in a position to deliver said logs, and could have and would have delivered same if he could have gotten cars from defendant company.

"Plaintiff further shows the court that, in order to carry out the contract aforesaid with the Bradford-Hicks Lumber Company, it was not possible for him, during the said 78 days or any one of said days, to engage in any other work or utilize the teams or wagons during that time for any purpose whatsoever."

Damages were laid in the sum of $4,095, and judgment asked in that amount.

In addition to a general demurrer, special exceptions, and general denial, the defendant pleaded, in substance, as follows:

"That Bradford spur, from which the logs were being shipped, was built for the sole and exclusive use and benefit of the Bradford-Hicks Lumber Company, said company assisting in the expense of its construction, and that plaintiff was a total stranger to the contract and agreement between the representatives and officials of the railway company and the representatives and officials of the lumber company with reference to said spur; that the manager for the Bradford-Hicks Lumber Company was vested with the authority to direct the movement of the logs handled from said spur, it being further stipulated that the logs should be moved in sufficient quantities to log the saw mill. If the logs were not moved in sufficient quantities for that purpose, it was provided that notice should be given by the lumber company, and the service would be improved accordingly; furthermore, that plaintiff was only an agent or employé of the Bradford-Hicks Lumber Company in the matter of loading said logs at Bradford, having no rights in the spur, and no right to demand that cars be placed for his benefit, and no right to ask or require the movement of such logs as were placed any more rapidly than said Bradford-Hicks Lumber Company desired and requested same to be moved."

The cause was tried in the court below with a jury, and verdict and judgment rendered in favor of plaintiff for the sum of $1,560.

The undisputed evidence establishes the following facts: The spur known as Bradford's spur, and upon which plaintiff contracted to deliver the logs sold by him to the lumber company and load same on cars to be provided by the lumber company, was constructed under a contract made by appellant and the lumber company some time prior to the contract between the lumber company and plaintiff. The contract under

which the spur track was built provided that the lumber company would do the grading and furnish the ties, and that the railroad company would furnish the rails and the labor necessary to complete the track. The spur was built exclusively for the benefit of the lumber company, to facilitate the transportation for it of timber purchased near said spur, and it was expressly agreed that the railroad company would not be required to give any special service on said spur, but that cars taken from said spur would only be taken by the regular local freight trains. Mr. Hall, the superintendent of the railway company at the time the spur was constructed, testified:

"I built the spur known as Bradford's spur, in Liberty county. It is located about two miles west of Hardin, between Hardin and Sandune. This spur was built for the Bradford-Hicks Lumber Company, who own and operate a mill at Dyersdale, and they applied to the company for this spur, stating that they had bought a tract of timber that they wished to log to the Dyersdale mill. That statement was made to the general manager. There was an agreement entered into for the building of this spur. It was entered into at Beaumont, Tex., and there were present at the time Mr. Hicks, of the Bradford-Hicks Lumber Company, one of the owners, and Mr. Wurtzbaugh, who was their manager, also Mr. Elliott, the general manager of the railroad company, Mr. Anderson, chief clerk to the general manager, and myself. At that time the arrangement was made that the spur would be put in as required by the company, the lumber company doing the grading and furnishing the ties; the railroad company to furnish the rails and lay them. It was further understood that we would furnish cars to the lumber company, which they would equip, and which would be used in that service, these cars to be moved back and forth by the local trains, with no special service; that is, that they would only be moved on such trains as could handle them. It was understood that they would not be moved on through trains, which was part of the consideration for putting in this spur, and was also understood that no special service would be demanded or required. The station nearest to Bradford from where general freight is handled is Hardin. There is no agent at Bradford spur; it being a blind siding. The character of shipments made from Bradford spur have been logs, and a few cars of wood. The Bradford-Hicks Lumber Company have shipped from there, and the Thompson-Ford people made some shipments from there, but I told the manager of that company that they could not use this spur without permission from the Bradford-Hicks Lumber Company. We knew no one else than the Bradford-Hicks Lumber Company in connection with the putting in of that spur. The agreement was with them. We dealt with Mr. Wurtzbaugh, their manager, and it was understood that he was to be the representative of the lumber company with reference to the handling of those shipments. It was understood that Mr. Wurtzbaugh was to direct the movement of those cars. When they were emptied at the mill he would direct where they would be taken for loading. This company had other spurs upon which they were operating at the time, and Mr. Wurtzbaugh, to my knowledge, was directing the movement of cars to other points at the same time, and in a similar manner. There were some three or four places. Bradford spur was not designated on any timetable as a station from which general shipments would be made, and general shipments were not, in fact, made from there—nothing but logs. Everything that moved from there moved under a bill of lading made out by whoever loaded the freight. The shipper would make out the bill of lading and present it to the conductor passing, or put it in the box there for that purpose, and he would pick up the bill of lading and take it to Huffman; all the billing was done at the next station west. * * * I never saw Mr. Moore until a few days ago; never made his acquaintance before. I had no notice from any one of contract arrangements between A. I. Moore and the Bradford-Hicks Lumber Company concerning the shipment of logs from Bradford spur. I knew nothing about that."

The manager of the lumber company, Mr. Wurtzbaugh, corroborated the testimony of Mr. Hall as to the terms and conditions of the contract under which the spur was constructed. He further testified:

"Our agreement with the railroad was that we were to require no special service; that is, we were to take local train service with our logs. If they came along and logs were loaded, and they could pull them, we could expect them to pull them. * * * We were to take them when they could get them to us. We were not logging enough for them to put on a train, you understand, just to haul our logs, and they could not afford for their through trains to stop and pick up logs; it would delay them too much; and if we would agree to just take local service they would gladly haul our logs for us; and we agreed to it, and, of course, if it hurt us (and it did; I will admit it hurt us), we had no complaint to make. We probably lost a little time at the mill. They were living right up to their agreement with us in all those shipments of logs, because we agreed to take local service. They did not tell us how often they could bring them, but would do us just like they did others. I could not tell you just when this understanding was had with reference to the time we agreed to have the spur put in. It was understood that they would allow us to put it in, or help put it in, under those conditions, and that if we would take local service for the shipment of the logs. It is the best I can state it. Mr. Moore was not a party at all to that agreement, and had nothing to do with it as far as my knowledge is concerned. The contract with Mr. Moore was later. We had hauled no logs prior to making this contract with him."

The witness Wurtzbaugh, as well as plaintiff himself, testified that all the logs were ultimately loaded and hauled and paid for.

The contract of sale of the timber executed by plaintiff to the lumber company, after describing the land from which the timber was to be taken, and reciting that plaintiff had purchased said timber from parties named in the instrument, contains the following recitals and provisions:

"The said Bradford-Hicks Lumber Company has agreed to advance me the sum of six hundred ($600.00) dollars for the purpose of paying the purchase money therefor to the above-mentioned parties who sold me said timber, and it is also agreed and understood that I am to with all due diligence cut, haul, and load said timber on said cars provided by said company on the Beaumont, Sour Lake & Western Railway, at a new siding or spur, about one and one-half miles east of Sandune, and about seven and one-half miles northeast of the town of Liberty. And in consideration for said timber so delivered, and for the cutting and loading thereof, the said company is to pay me the sum of seven ($7.00) dollars per thousand feet therefor, provided, however, the company shall retain $2.50 per thousand feet on each thousand feet cut and delivered until they receive in that manner the full sum of six hundred ($600.00) dollars to pay them that amount advanced

to me as aforesaid, and thereafter I am to be paid the full sum of seven ($7.00) dollars per thousand feet for all of said timber remaining."

Plaintiff testified that he made several complaints to the defendant of its failure to furnish sufficient cars and to more promptly transport the cars loaded by him. One of these complaints was made by letter addressed to Mr. Hall, superintendent or manager of defendant company. He also complained by letter to the man who succeeded Mr. Hall, and complained several times to Mr. Rye, defendant's station agent at Hardin, which was the nearest station on defendant's road to said spur.

Evidence was introduced, over defendant's objection, which is sufficient to sustain the finding that, by reason of the failure of defendant to furnish more cars and to more promptly transport the cars loaded by plaintiff at said spur, he sustained damages as alleged in his petition in the amount found by the jury. The evidence also shows that Mr. Barrett and Mr. Raines were engaged in logging for the lumber company at the time this spur was put in, and the special purpose of the lumber company in obtaining the spur was to facilitate the handling of the Barrett and Raines logs. Because of its advantage to Barrett and Raines in carrying out their contract with the lumber company, they assisted said company in constructing said spur. Plaintiff testified that he voluntarily paid Barrett $20 as compensation for the work done by him in constructing said spur, but there is no evidence that either the defendant or the lumber company had any notice of the fact that he had contributed anything towards the construction of the spur.

It would serve no useful purpose to set out and discuss the various assignments of error presented in appellant's brief. We think the evidence fails to show any liability of defendant for the damages claimed by plaintiff, and appellant's several assignments complaining of the refusal of the trial court to instruct the jury to return a verdict for the defendant must be sustained.

[1] It is clear that appellant was under no contract obligation to plaintiff to furnish cars or to receive and transport freight for him from Bradford's spur. The contract between appellant and the lumber company was not made for plaintiff's benefit, and he was an entire stranger thereto. It is not even shown that at the time this contract was made the contract between the plaintiff and the lumber company was in contemplation of either of them, and the undisputed evidence shows that the defendant had no notice that plaintiff had any present or prospective interest in said contract. In his contract with the lumber company plaintiff recognizes the fact that appellant was under no obligation to furnish cars for shipment of logs from Bradford's spur by stipulating that the cars for such shipments were to be furnished by the lumber company.

[2] We think it equally clear that defendant was under no obligation to plaintiff as a member of the public to furnish cars for shipment of freight from said spur. Railroads are only required by law to furnish cars for the shipment of freight at stations or points on their road provided for the service of the public, or where the railroads are in the habit of accepting freight from any person offering same for transportation. The spur in question was a private track built for the sole and special use of the lumber company, and was under the exclusive control of that company. The railroad company could not, without violating its contract with the lumber company, which had assisted in the construction of the spur, place cars thereon for the use of shippers generally, unless by permission of said company.

[3] In addition to this it is shown by the evidence that plaintiff was not offering any freight for shipment from said spur. Under his contract with the lumber company the logs became the property of the company when placed on the cars at the spur, and the company was to furnish the cars upon which the logs were to be loaded, and no demand is shown to have been made by plaintiff of defendant at any time to furnish him any specified number of cars at said spur, but only a complaint that not enough cars were furnished and those furnished and loaded were not transported as promptly as they should be. A complete answer to this complaint is that the appellant was under no contract obligation to furnish cars for the prompt moving of timber purchased by the lumber company, and if it had been, appellee was not a party to that contract, and could claim no rights thereunder, and appellant was under no legal obligation to furnish cars to appellee for shipment of freight for him from said spur, and no sufficient demand was made upon it by appellee to furnish him cars for such shipments.

[4] There is another obvious reason for holding that the appellant is not liable for the damages claimed by appellee. Such damages are special in their nature, not such as would usually and probably result from delay in the transportation of timber, and, if appellant owed a duty to appellee to furnish more cars and to more promptly transport the loaded cars from said spur, it could not be held liable for the damages claimed by appellee for its failure to perform this duty because it had no notice of the contract between appellee and the lumber company and no knowledge of the facts which would make the damages claimed by appellee the probable result of such failure on the part of appellant. Calvit v. McFadden, 13 Tex. 324; Express Co. v. Darnell, 62 Tex. 640; Railway Co. v. Belcher, 89 Tex. 428, 35 S. W. 6.

It follows from these views as to the rules of law applicable to the undisputed facts disclosed by the record that the judgment of

the court below should be reversed, and judgment here rendered for the appellant; and it has been so ordered.

Reversed and rendered.